IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMBER ALBRIGHT,<br><br>    Plaintiff,<br><br>v.<br><br>HUEL, Inc.,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Amber Albright ("Plaintiff") brings this action against Defendant Huel, Inc. ("Defendant"), individually and on behalf of all others similarly situated, and alleges upon personal knowledge as to Plaintiff's acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys as follows:

### Summary of Defendant's Contaminated Protein Powder

1. Defendant sells protein powder products, which includes the Huel Black Edition Powder (the "Product"). While Defendant markets the Product as a "High-protein complete meal," the Product is, in fact, contaminated with lead and cadmium.

2. There are no "safe" levels of lead in food products.

3. The World Health Organization ("WHO") states: "There is no level of exposure to lead that is known to be without harmful effects."[1]

4. The U.S. Centers for Disease Control and Prevention ("CDC") states: "There are no safe levels of lead in the blood."[2]

---

[1] World Health Organization, *Lead Poisoning* (Aug. 11, 2023), *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (emphasis orignial)

[2] Centers for Disease Control and Prevention, *About Childhood Lead Poisoning Prevention* (May 23, 2024) *available at* https://www.cdc.gov/lead-prevention/about/index.html

5. Lead affects numerous organs and systems in the body and accumulates over time. This leads to health risks and toxicity, including hindering neurological function, anemia, and kidney damage.[3]

6. No reasonable consumer would buy the Product if they knew the Product contained toxic and harmful ingredients such as lead and cadmium.

7. Further, the Product's marketing, specifically its statement that it is a "High-protein complete meal" gives consumers the impression that the Product is healthy—and certainly not that the Product contains toxic heavy metals.

8. An investigation conducted by Consumer Reports found that a single serving of the Product contains 6.3 micrograms of lead.[4] Neither Illinois nor the Federal government recognizes a safe level of lead, but California has established a "safe harbor" level of 0.5 micrograms of lead.

9. A single serving of the Product thus contains more than twelve times this "safe harbor" level of 0.5 micrograms of lead.

10. A single serving of the Product also contains more than double the amount of cadmium that health experts consider safe for daily ingestion.[5]

11. Plaintiff brings this action individually and on behalf of those similarly situated seeking redress for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, negligent misrepresentation, and unjust enrichment.

---

[3] Wani AL, et al., *Lead toxicity: a review*, INTERDISCIP TOXICOL. (June 2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4961898

[4] *See* Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead*, Consumer Reports (Oct. 14, 2025) (the "CR Investigation"), available at https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last visited Oct. 22, 2025).

[5] *Id.*

2

## Parties

12. Plaintiff Amber Albright resided, at all times relevant to this Complaint, in Williamson County, Illinois.

13. Defendant Huel, Inc. is a Delaware corporation with its principal place of business in New York, New York.

## Jurisdiction and Venue

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant (Defendant is a Delaware corporation with its principal place of business in New York); and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interest and costs.

15. Plaintiff seeks to represent Class members in Illinois, who are citizens of a different state than Defendant.

16. The matter in controversy in this case exceeds $5,000,000 in the aggregate, exclusive of interest and costs.

17. The number of members of the proposed Class exceeds 100.

18. This Court has personal jurisdiction over Defendant because this action arises out of and relates to Defendant's substantial aggregate contacts within this District.

19. Defendant has engaged in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout this District, including because Defendant placed the Product into the stream of commerce directed at this District, and because Defendant purposely availed itself of the laws of the State of Illinois.

20. In accordance with 28 U.S.C. §§ 1391(a) and (b), venue is proper in this District

because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this judicial District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this District.

## Factual Allegations

### Exposure to Lead is Harmful to Human Health

21.     The Illinois Department of Public Health notes that "[l]ead in the body is not safe at any level. Even very small amounts of lead can permanently damage the brain as it develops. The only way to prevent damage from lead is to prevent exposure to lead."[6]

22.     The World Health Organization says that "exposure to lead can affect multiple body systems" and that "there is no level of exposure to lead that is known to be without harmful effects."[7]

23.     "Lead can be absorbed by the intestine and through the skin, and almost 90% of it binds to red blood cell proteins. Once inside the human body, lead may travel to different tissues and organs, including the liver and kidneys, where it can cause damage to cells and tissues."[8]

24.     "Lead alters very basic nervous system functions, like calcium-modulated signaling, at very low concentrations in vitro."[9] "Imaging studies of adults who had elevated blood lead levels in childhood have demonstrated region-specific reductions in the brain's

---

[6] https://dph.illinois.gov/content/dam/soi/en/web/idph/files/publications/what-you-should-know-about-lead-exposure-042116.pdf

[7] *Lead Poisoning*, WORLD HEALTH ORGANIZATION, *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health#:~:text=Lead%20in%20the%20body%20is,measurement%20of%20lead%20in%20blood.

[8] The Institute for Functional Medicine, *Low-Level Lead Exposure and Health Risks* (Nov. 14, 2024) available at https://www.ifm.org/articles/low-level-lead-exposure-implications-human-health

[9] https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children/#:~:text=Lead%20alters%20very%20basic%20nervous,other%20events%20crucial%20to%20development.

volume and alterations of its microstructure, as well as a significant impact on brain reorganization."[10]

25. "Lead is particularly dangerous because it can accumulate in the body over time, leading to chronic exposure even from small amounts."[11]

26. Lead exposure and its relation to hypertension have been demonstrated in the literature, with increases in blood lead level increasing blood pressure.[12] "Lead's effect on the cardiovascular system and cardiovascular-related markers has been well noted in the literature. The mechanism by which lead induces hypertension may be related to oxidative stress, inflammation, alterations in the renin–angiotensin–aldosterone system, alteration of vasoactive and volume regulatory hormones, and nitric oxide dysregulation, among other mechanisms."

27. Cancer-specific mortality has been associated with urinary lead levels.[13]

28. Lead exposure at low-levels is a recognized "risk factor for cardiovascular disease."[14] A study examining 14,289 adults in the U.S. found "that concentrations of lead in blood lower than 5 μg/dL (<0·24 μmol/L) are associated with all-cause mortality, cardiovascular disease mortality, and ischaemic heart disease mortality."[15]

---

[10] *Id.*

[11] MM Coveny, *The Dangers of Lead in Food: Understanding the Risks and Protecting Your Health*, Food Poisoning News (Aug 20, 20224) available at https://www.foodpoisoningnews.com/the-dangers-of-lead-in-food-understanding-the-risks-and-protecting-your-health/

[12] Obeng-Gyasi E. Lead Exposure and Cardiovascular Disease among Young and Middle-Aged Adults. Medical Sciences. 2019; 7(11):103. https://doi.org/10.3390/medsci7110103

[13] Li Sen, Wang Jiaxin, Zhang Biao, Liu Yuan, Lu Tao, Shi Yuanyuan, Shan Guangliang, and Dong Ling, *Urinary Lead Concentration Is an Independent Predictor of Cancer Mortality in the U.S. General Population.* Frontiers in Oncology, 8 (ISSN=2234-943X) (2018).

[14] Bruce P. Lanphear, Stephen Rauch, Peggy Auinger, Ryan W. Allen, and Richard W. Hornung, *Low-level lead exposure and mortality in US adults: a population-based cohort study.* The Lancet, 3(4):E177-E185 (April 2018).

[15] *Id.*

5

**Cadmium Exposure is Also Harmful to Humans**

29. Cadmium is a heavy metal and its presence in food poses a serious safety risk to consumers because it is a cancer-causing agent. "The Department of Health and Human Services (DHHS) has determined that cadmium and cadmium compounds are known human carcinogens."[16] The Centers for Disease Control has recognized "that there is no safe level of exposure to a carcinogen."[17]

30. "[A]ny cadmium exposure should be avoided."[18] According to the Centers for Disease Control and Prevention, exposure to even low levels of cadmium over time may build up cadmium in the kidneys and cause kidney disease.[19] And, because cadmium builds up in the body, even at low dosage, repeated exposure can cause lung damage and fragile bones. *Id*. Consuming cadmium can also severely irritate the stomach, causing vomiting and diarrhea. *Id*.

31. Research has linked cadmium exposure with kidney dysfunction and decreases in bone mineral density.[20] Indeed, cadmium "is a toxic heavy metal" that is a "severe health threat"

---

[16] *ToxFAQs for Cadmium,* CDC AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, *available at* https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=47&toxid=15#:~:text=Eating%20food%20or%20drinking%20water,lung%20damage%20and%20fragile%20bones

[17] NIOSH Chemical Carcinogen Policy, Centers for Disease Control, available at https://www.cdc.gov/niosh/cancer/about/niosh-chemical-carcinogen-policy.html?CDC_AAref_Val=https://www.cdc.gov/niosh/topics/cancer/policy.html

[18] M. Nathaniel Mead, Cadmium Confusion: Do Consumers Need Protection? Environmental Health Perspectives, Dec. 2010, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/

[19] *ToxFAQs for Cadmium,* CDC Agency for Toxic Substances and Disease Registry, *available at* https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=47&toxid=15#:~:text=Eating%20food%20or%20drinking%20water,lung%20damage%20and%20fragile%20bones

[20] Soisungwan Satarug, et al., *Adverse Health Effects of Chronic Exposure to Low-Level Cadmium in Foodstuffs and Cigarette Smoke,* ENVIRONMENTAL MEDICINE VOL. 112, NO. 10, *available at* https://ehp.niehs.nih.gov/doi/full/10.1289/ehp.6751.

to humans.[21] Cadmium "largely accumulates in kidneys, liver, bone and other organs and causes irreversible damage to the target organs." *Id*.

**Defendant Markets the Product as Healthful, not Harmful**

32. Defendant advertises and markets the Product as safe and healthy, and not high in lead and cadmium.

33. For example, Defendant states that "Here at Huel, excellent nutrition and health are key, so we have listed some of the information that confirms this commitment to health and safety throughout all aspects of Huel."[22]

34. Defendant touts the supposed health benefits of the Product, such that it is a "nutritionally complete powdered food that is high in protein and fiber, reduced carbohydrate, and rich in healthy fats" and that it meets "the HHS and USDA's Dietary Guidelines and Daily Value (DV) requirements for all macro- and micronutrients, and proportion them to provide what you need from a meal."[23]

35. Defendant also states that it "continue[s] to test ingredients, batches, and finished products to maintain complete oversight of our supply chain and ensure safety from start to finish."[24] Defendant has made similar, varying claims with regards to heavy metals throughout the Class period.

36. Despite Defendant's claims, independent third-party testing has revealed that the Product contains high levels of both lead and cadmium. Defendant deceptively marketed and

---

[21] Mei Wang, et al., *A review on Cadmium Exposure in the Population and Intervention Strategies Against Cadmium Toxicity,* BULLETIN OF ENVIRONMENTAL CONTAMINATION AND TOXICOLOGY (Jan. 23, 2021), *available at* https://link.springer.com/article/10.1007/s00128-020-03088-1

[22] *See* https://huel.com/pages/huel-food-safety-and-quality-controls.

[23] *See* https://huel.com/pages/the-huel-black-edition-formula-explained.

[24] *See* https://huel.com/pages/heavy-metals-in-protein-powders.

advertised the Product as safe while concealing and failing to disclose that the Product contains dangerous concentrations of these heavy metals.

37. Based on investigative reporting by Consumer Reports, a single serving of the Product was found to contain 6.3 micrograms of lead, which is more than twelve times the California "safe harbor" level, as well as Consumer Reports' recommended daily lead limit.[25]

38. Based on the average daily lead exposure from other foods, a single, daily serving of the Product would also cause an individual to "exceed[] the FDA's interim reference level for dietary lead."[26]

39. The CR Investigation also found that the Product contained 9.2 micrograms of cadmium, "more than double the level that public health authorities and [Consumer Reports]'s experts say may be harmful to have daily, which is 4.1 micrograms."[27]

**Reasonable Consumers Are Deceived by Defendant's Misrepresentations**

40. As alleged above, the harmful health impacts of lead and cadmium are well established.

41. Consumers, like Plaintiff, want to know if a product they eat contains substances which are hazardous to their health. Consumers, like Plaintiff, want to know if a product they eat contains substances which are declared to be unsafe by governmental organizations.

42. Defendant's nondisclosure of the lead and cadmium in the Product is material because reasonable consumers would deem the presence of these substances in the Product to be important in determining whether to purchase the Product. Defendant has exclusive knowledge that the Product contains lead and cadmium since reasonable consumers do not test food

---

[25] *See* CR Investigation, *supra* n. 4.
[26] *Id.*
[27] *Id.*

products before they eat them.

43. Consumers, like Plaintiff, trust that the food products they purchase do not contain toxic heavy metals like lead and cadmium which have been intentionally or negligently added to the Product.

44. Defendant has a duty to disclose the presence of lead and cadmium in the Product because the fact is known to Defendant (that the Product contains lead and cadmium), and the failure to disclose the lead and cadmium in the Product is misleading.

45. The lead and cadmium in the Product implicates a health concern that is important to reasonable consumers when deciding to purchase Defendant's Product. This is especially true when the marketer makes a partial omission about the quality of the product like Defendant does here.

46. A failure to disclose a fact constitutes actionable conduct if the omission goes to the central function of the product. Here, the Product's central function is for people to safely consume the Product. Food products that contain harmful lead and cadmium do not serve this central function.

47. The Product contains lead and cadmium in quantities exceeding the thresholds considered safe by public health experts, posing health risks to children and pregnant individuals, as well as other adults.

48. Neither the Product's advertising, marketing, or packaging discloses, informs, or otherwise warns consumers that the Product contains dangerous levels of lead and cadmium.

49. Defendant intended that consumers rely on its nondisclosure of the elevated levels of lead and cadmium in the Product.

50. Defendant misleads consumers by failing to disclose the high levels of lead and

cadmium in the Product, limiting consumers' ability to make informed purchasing decisions.

51. In fact, Defendant affirmatively represented that the Product was healthy and safe. That it was a "nutritionally complete powdered food that is high in protein and fiber," with the USDA's Daily Value for "all macro- and micronutrients . . . ."), and that it was free of dangerous ingredients, and thoroughly-tested so that it would remain so.

52. Defendant concealed the risk to consumers of exposure to lead and cadmium from the Product and continued to market the Product as healthy and safe. Defendant recklessly disregarded its duty to ensure the Product was manufactured safely, resulting in products tainted with harmful heavy metals.

53. As a result of Defendant's misrepresentations and omissions, consumers paid a price premium for products containing high levels of harmful toxins. The Product is worth much less than consumers paid—or nothing at all—because it contains dangerous levels of these toxins. Plaintiff and Class members suffered real economic harm.

54. Defendant's misrepresentations and omissions deprived consumers of the ability to make informed decisions and induced them to pay a price premium for a product that is, in fact, worth significantly less, or nothing at all.

55. As described above, Plaintiff suffered an actual and imminent threat of future harm that cannot be cured with monetary damages. For this harm, Plaintiff lacks an adequate remedy at law and requires injunctive relief.

### Plaintiff's Purchases of the Product

56. Plaintiff purchased the Product online on June 21, 2024; August 30, 2024; October 17, 2024; November 22, 2024; and December 20, 2024.

57. Plaintiff consumed the Product on a daily or near-daily basis.

58. When purchasing the Product, Plaintiff was not aware of the lead and cadmium in

it. Plaintiff purchased the Product on the assumption that the marketing and advertising was accurate and complete, and that the Product did not contain harmful substances like lead or cadmium and that the Product was safe, healthy, and high quality as represented by the marketing and advertising.

59. Plaintiff would not have purchased the Product had she known the Product contained lead and cadmium, substances which are known to be hazardous to human health.

60. Had Plaintiff known that there are protein powders on the market with much lower levels of lead or cadmium, she would not have bought Defendant's Product.

61. By purchasing the deceptively advertised Product, Plaintiff suffered injury in fact when she spent money to purchase the Product she would not have purchased absent Defendant's deceptive practices.

62. Plaintiff continues to see the Product for sale online and in marketing emails from Defendant and desires to purchase the Product again if the Product did not contain high levels of lead and cadmium or were marketed and advertised in a non-deceptive manner.

63. However, as a result of Defendant's ongoing affirmative misrepresentations and material omissions, Plaintiff is unable to rely on the Product's marketing and advertising when deciding in the future whether to purchase the Product.

## Class Action Allegations

64. Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

> All individuals in Illinois who purchased the Product within the relevant limitations period.

65. Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial

officers and their immediate family members and associated court staff assigned to the case; and (iv) individuals who received a full refund of the Product from Defendant.

66. Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

67. The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

68. <u>Numerosity</u>: While the precise size of the Class is currently unknown to Plaintiff, it is clear that the number of individuals who are members of the putative Class described above ("Class Members") is sufficiently high that individual joinder of all Class Members is impracticable. Plaintiff believes that there are thousands of Class Members who have been damaged by Defendant's deceptive and misleading practices.

69. <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

70. Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Product;

    a. Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Product;

    b. Whether Defendant made omissions or misrepresentations concerning the Product

that were likely to deceive the public;

   c.   Whether Defendant made omissions about the Product that were material to the purchasing decisions of consumers;

   d.   Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

   e.   Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members; and

   f.   Whether Defendant was unjustly enriched by the conduct described herein.

71.   <u>Typicality</u>: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Product. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

72.   <u>Adequacy</u>: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

73.   The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to

the other available methods for the fair and efficient adjudication of this controversy because:

    a. The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

    b. The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

    c. When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

    d. This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

    e. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

    f. This class action will assure uniformity of decisions among Class Members;

    g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

    h. Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action.

74. Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual Class Members would create a risk of varying adjudications with respect to individual Class Members, which could establish inconsistent standards of conduct for Defendant.

75. Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

76. Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

77. Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## First Cause of Action
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1, *et seq.*

78. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

79. The Illinois Legislature passed the Illinois Consumer Fraud Act, 815, ILCS 505/1, et seq. (the "ICFA") to protect Illinois consumers from fraud and unfair or deceptive acts in commerce.

80. Defendant is a "person" as defined by 815 ILCS 505/1(c).

81. The Product is "merchandise" as that term is defined by 815 ILCS 505/1(b).

82. Defendant offers the Product for "sale" as defined by 815 ILCS 505/1(d).

83. Defendant, by selling and distributing the Product in Illinois, conducts "trade" or "commerce" as those terms are defined by 815 ILCS 505/1(f).

84. Plaintiff and Class Members purchased the Product for their own use or for use by a member of their household and not for resale.

85. Under the ICFA, it is unlawful to use, in the conduct of any trade or commerce, "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . ." 815 ILCS 505/2.

86. Whether the Product contains elevated and potentially dangerous levels of lead and cadmium is a material fact to consumers of the Product, who thought they were buying a healthy, safe, "nutritionally complete powdered food" when they purchased the Product.

87. Defendant intended that consumers, including Plaintiff and Class Members, rely on the concealment, suppression and/or omission of the material fact that the Product contain elevated and potentially dangerous levels of lead and cadmium.

88. Defendant's conduct is likely to mislead or deceive reasonable consumers, and Defendant intended to mislead or deceive reasonable consumers.

89. Defendant's conduct constitutes an unfair or deceptive act or practice under the ICFA.

90. Plaintiff and Class Members were misled and deceived by Defendant's conduct.

91. Defendant's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff and Class Members suffering actual damage.

92. Plaintiff and the Class suffered injury in fact and lost money as a result of purchasing the Product due to Defendant's unlawful, unfair, and deceptive conduct.

93. Plaintiff and Class Members were injured through their purchase of the Product,

including because they would not have purchased the Product on the same terms if they had known the truth, and they paid a price premium for the Product.

94. Plaintiff seeks equitable and injunctive relief to stop Defendant's misconduct, as complained of herein, and seeks restitution of the amounts Defendant acquired through the unfair, unlawful, and fraudulent business practices described herein, including based on a refund of the purchase price paid for the Product.

## Second Cause of Action
## Unjust Enrichment

95. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

96. Plaintiff brings this cause of action on behalf of herself, and the Class.

97. Defendant, through its misleading omissions, enticed Plaintiff and Class Members to purchase the Product.

98. Plaintiff and Class Members conferred a benefit on Defendant by purchasing the Product.

99. By its wrongful acts, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

100. Defendant benefitted financially from the revenues and other compensation tied to the sale of the Product, which was unjust in light of Defendant's wrongful conduct.

101. Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits it received from Plaintiff and Class Members as the result of its deceptive marketing and advertising practices.

102. Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiff and Class Members is unjust and inequitable, Plaintiff seeks restitution from, and an

order disgorging all profits, benefits and other compensation obtained by Defendant due to its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of the Class, prays for an Order as follows:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing her counsel as class counsel;

B. Declaring that Defendant's conduct violates the statutes referenced herein;

C. Awarding all actual, general, special, incidental, punitive, statutory, and consequential damages to which Plaintiff and Class members are entitled;

D. Awarding pre-judgment and post-judgment interest on such monetary relief;

E. Granting appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to accurately and truthfully advertise, market and sell the Product;

F. Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees; and

G. Awarding such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

//

//

//

//

//

          Respectfully Submitted,

          **Amber Albright**, individually and on behalf of all others similarly situated.

Dated: October 27, 2025          CROSNER LEGAL, P.C.

          By:    s/ Adam C. York
                    Adam C. York

          Adam C. York (6294143)
          adam@crosnerlegal.com
          Zachary Crosner (6343989)
          zach@crosnerlegal.com
          1016 West Jackson Blvd. Ste. 197
          Chicago, Illinois 60607
          Tel: (866) 276-7637
          Fax: (310) 510-6429

          *Attorneys for Plaintiff*